UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ——————————————— x | : | Civil Action No. 1:21-cv-1640 |
| JENNIFER M. SROCK, Individually and on Behalf of All Others Similarly Situated, | : | |
| | : | <u>CLASS ACTION</u> |
| Plaintiff, | : | |
| | : | COMPLAINT FOR VIOLATION OF THE |
| vs. | : | SECURITIES EXCHANGE ACT OF 1934 |
| | : | |
| MULTIPLAN CORPORATION f/k/a CHURCHILL CAPITAL CORP. III, MICHAEL KLEIN, JAY TARAGIN, MARK KLEIN, MICHAEL ECK, GLENN R. AUGUST, PAUL GALANT, JEREMY PAUL ABSON, MALCOLM S. McDERMID, KAREN G. MILLS, BONNIE JONAS, MARK TABAK, DAVID REDMOND, M. KLEIN AND COMPANY, CHURCHILL SPONSOR III, LLC and THE KLEIN GROUP LLC, | : | |
| | : | |
| Defendants. | : | |
| ——————————————— x | : | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Jennifer M. Srock ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by MultiPlan Corp. f/k/a Churchill Capital Corp. III ("Churchill III" or the "Company"), Company press releases and earning calls, and analyst and media reports about the Company.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.     This is a securities class action on behalf of: (i) all purchasers of Churchill III securities between July 12, 2020 and November 10, 2020, inclusive (the "Class Period"); and (ii) all holders of Churchill III Class A common stock entitled to vote on Churchill III's merger with and acquisition of Polaris Parent Corp. and its consolidated subsidiaries (collectively, "MultiPlan") consummated in October 2020 (the "Merger").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a) and 78t(a); SEC Rule 10b-5, 17 C.F.R. §240.10b-5; and SEC Rule 14a-9, 17 C.F.R. §240.14a-9.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

3.     Venue is proper in this District pursuant to §27 of the Exchange Act.  The acts and transactions giving rise to the violations of law complained of occurred in this District, including the creation and dissemination of the false and misleading statements detailed herein.  Churchill III and

MultiPlan both maintained headquarters in this District before and after the Merger.  Furthermore, the Churchill III securities that are the subject of this action were traded in this District.

4.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

**PARTIES**

5.      Plaintiff Jennifer M. Srock purchased Churchill III securities during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

6.      Defendant Churchill III is a blank check company that merged with MultiPlan, a healthcare cost specialist.  The Company's Class A common shares trade in New York on the New York Stock Exchange ("NYSE") under the symbol "MPLN," and its public warrants trade under the symbol "MPLN.WS."  Prior to the Merger, Churchill III Class A stock traded under the symbol "CCXX," its public warrants traded under the symbol "CCXX.WS," and its ownership units, which contained both stock and fractional warrants, traded under the symbol "CCXX.U."

7.      Defendant Michael Klein was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of Churchill III prior to the Merger and remained a Churchill director following the Merger.  Defendant Michael Klein is also the founder and a managing partner of defendant M. Klein and Company.

8.      Defendant Jay Taragin ("Taragin") served as the Chief Financial Officer ("CFO") of Churchill III prior to the Merger.  Defendant Taragin is also the CFO of defendant M. Klein and Company.

9.      Defendant Mark Klein served as a member of the Board at the time of the Merger. Defendant Mark Klein is also a managing partner of defendant M. Klein and Company.

10.     Defendant Michael Eck served as a member of the Board at the time of the Merger. Defendant Michael Eck is also a managing director of defendant M. Klein and Company.

11.     Defendant Glenn R. August ("August") served as a member of the Board at the time of the Merger.  Defendant August was the CEO and founder of Oak Hill Advisors, L.P., a strategic partner of defendant M. Klein and Company at the time of the Merger.

12.     Defendant Paul Galant ("Galant") served as an Operating Partner of Churchill III prior to the Merger and became the Company's President of New Markets following the Merger.

13.     Defendant Jeremy Paul Abson served as a member of the Board at the time of the Merger.

14.     Defendant Malcolm S. McDermid served as a member of the Board at the time of the Merger.

15.     Defendant Karen G. Mills served as a member of the Board at the time of the Merger.

16.     Defendant Bonnie Jonas served as a member of the Board at the time of the Merger.

17.     The defendants named in ¶¶7-16 are collectively referred to herein as the "Churchill Individual Defendants."

18.     Defendant Mark Tabak ("Tabak") served as the Chairman and CEO of MultiPlan prior to the Merger and as Chairman and CEO of Churchill III after the Merger.

19.     Defendant David Redmond ("Redmond") served as the CFO of MultiPlan prior to the Merger and as CFO of Churchill III after the Merger.

20.     The defendants named in ¶¶18-19 are collectively referred to herein as the "MultiPlan Individual Defendants."

21.     The Churchill Individual Defendants and the MultiPlan Individual Defendants are collectively referred to herein as the "Individual Defendants."

22.     Defendant M. Klein and Company ("M. Klein") purports to be a "global strategic advisory firm."  It is a serial sponsor of blank check companies.  It sponsored the initial public offering for Churchill III through various related affiliates and investment vehicles.

23.     Defendant Churchill Sponsor III, LLC ("Churchill III Sponsor") is a limited liability company established by defendant M. Klein to sponsor Churchill III.

24.     Defendant The Klein Group LLC ("KG") is an affiliate of defendants Michael Klein, Churchill III Sponsor and M. Klein and a wholly owned subsidiary of defendant M. Klein.

25.     The defendants named in ¶¶22-24 are collectively referred to herein as the "Blank Check Sponsor Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of Churchill III

26.     Churchill III was formed in October 2019 as a blank check company.  A blank check company is sometimes referred to as a special purpose acquisition vehicle, or "SPAC," and does not initially have any operations or business of its own.  Rather, it raises money from investors in an initial public offering and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.  As a result, investors in blank check companies rely on the skill, transparency and honesty of the blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound target company that offers attractive risk-adjusted returns for investors.

27.     On or about February 14, 2020, Churchill III completed its initial public offering, selling 110 million ownership units to investors for gross proceeds of $1.1 billion (the "IPO").  Each unit was priced at $10 and consisted of one share of Class A common stock and one-fourth of one warrant to purchase Class A shares.  Each whole warrant entitled the holder to purchase one share of Churchill III Class A common stock at $11.50 per share.

28.    The IPO was sponsored by defendant M. Klein, a New York-based strategic advisory firm owned and controlled by defendants Michael Klein, Mark Klein and other Company insiders. Defendant M. Klein is one of the most prolific creators of blank check companies in the world, having launched at least seven such companies since September 2018 which have raised billions of dollars from investors.

29.    While Churchill III did not identify any target companies at the time of the IPO, the IPO offering materials stated that the Company planned to pursue an acquisition that would "generate attractive returns for shareholders and enhance value through selecting a high quality target at an attractive valuation, negotiating favorable acquisition terms for our stockholders and improving operational performance of the acquired company."   The IPO offering materials repeatedly stated that Churchill III would benefit from the skill, diligence, connections and experience of defendant M. Klein.  The IPO offering materials stated that, in evaluating prospective target businesses, Churchill III, the Board and the Blank Check Sponsor Defendants would "conduct a thorough due diligence review which will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial, operational, legal and other information which will be made available to us."

30.    The IPO offering materials provided "investment criteria" that Churchill III purportedly used to evaluate target companies, which included the following:

- *Generates Stable Free Cash-Flow*.  We will seek to acquire a business that has historically generated, or has the near-term potential to generate, strong and sustainable free cash flow.

- *Would Benefit Uniquely from our Capabilities*.  We will seek to acquire a business where the collective capabilities of our management and sponsor can be leveraged to tangibly improve the operations and market position of the target.

- 5 -

- ***Is Sourced Through our Proprietary Channels***.  We do not expect to participate in broadly marketed processes, but rather will aim to leverage our extensive network to source our business combination.

- ***Has a Committed and Capable Management Team***.  We will seek to acquire a business with a professional management team whose interests are aligned with those of our investors and complement the expertise of our founder. Where necessary, we may also look to complement and enhance the capabilities of the target business's management team by recruiting additional talent through our network of contacts.

- ***Has the Potential to Grow Through Further Acquisition Opportunities***. We will seek to acquire a business that has the potential to grow inorganically through additional acquisitions.

31.     Pursuant to the IPO prospectus, Churchill III was required to acquire a target business with an aggregate fair market value of at least 80% of the assets held in trust from the IPO proceeds and to do so within two years of the February 2020 IPO.  In the event Churchill III did not complete an initial business combination, the Company was obligated to redeem 100% of its outstanding public shares equal to the aggregate trust proceeds plus interests.  Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.  If enough shareholders redeemed their shares, a deal would not be economically feasible.

32.     However, if Churchill III was successful in completing an initial business combination within the allotted time frame, the Blank Check Sponsor Defendants and various Company insiders would be richly rewarded.  Churchill III had issued founder shares to the Blank Check Sponsor Defendants in connection with the IPO equal to approximately 20% of the Company's outstanding common shares after the IPO.  These shares were automatically convertible into Churchill III Class A common stock if – and only if – the Company completed its initial business combination.  The founder shares were valued at $305 million at the time of the Merger and would expire worthless if the Blank Check Sponsor Defendants failed to convince enough

shareholders to vote to approve the Merger.  The Blank Check Sponsor Defendants also purchased 23 million private placement warrants in connection with the IPO that were worth approximately $50 million by the time of the Merger that would expire worthless if a business combination was not achieved.  Each of the Churchill Individual Defendants also had direct or indirect personal financial interests in the founder shares and warrants possessed by the Blank Check Sponsor Defendants.  In addition, defendant KG was slated to receive over $30 million in transaction and payment fees conditioned upon the completion of the Merger.  As a result, the Blank Check Sponsor Defendants and the Churchill Individual Defendants were highly incentivized to complete an initial business combination and to convince shareholders to approve the Merger.

33.     In July 2020, Churchill III announced that it had entered into a preliminary agreement, subject to shareholder approval, to merge with MultiPlan.  MultiPlan is a New York-based data analytics end-to-end cost management solutions provider to the U.S. healthcare industry.  MultiPlan's customers include large national insurance companies, provider-sponsored health plans, bill review companies, Taft-Hartley plans, and other entities that pay medical bills in the commercial healthcare, government, workers' compensation, auto, medical and dental markets.  MultiPlan fees are generally based on a percentage of savings achieved for its clients.  MultiPlan's revenues are highly concentrated in just a few clients, with its two largest customers accounting for 35% and 20%, respectively, of MultiPlan's fiscal 2019 revenues.

34.     The Merger, initially valued at $5.7 billion, would be funded by the IPO proceeds as well as billions of dollars in new debt and equity issuances.  As a result, the Merger would be substantially dilutive for Churchill III's existing shareholders, who were estimated to receive only 4% to 16% of the combined Company following the Merger depending on the number of shareholders who redeemed their shares.

35.     On September 18, 2020, Churchill III issued the proxy statement for the Merger, which urged shareholders to vote in favor of the deal and (as detailed below) contained numerous materially false and misleading statements and omissions (the "Proxy").  The Proxy stated that Churchill had identified MultiPlan as a potential acquisition target soon after the IPO.  By March 3, 2020 – only two weeks after the IPO – defendant Michael Klein had already contacted representatives of MultiPlan, including defendant Tabak, to discuss a potential deal.

36.     On the basis of the defective Proxy, on October 7, 2020, shareholders voted to approve the Merger at a special shareholders meeting.  Because of the defective Proxy, shareholders were prevented from the fully informed opportunity to redeem their shares as was their right.  The shares subject to redemption were valued in the Proxy at approximately $10 per share.

37.     On November 11, 2020 – only one month after the close of the Merger – short research investment firm Muddy Waters published a report on Churchill III titled "MultiPlan: Private Equity Necrophilia Meets The Great 2020 Money Grab" (the "Muddy Waters Report").  The Muddy Waters Report was based on extensive non-public sources such as interviews with former MultiPlan executives and other industry experts, as well as proprietary analysis.  The Muddy Waters Report revealed that MultiPlan was in the process of losing its largest client, UnitedHealthcare, which was estimated to cost the Company up to 35% of its revenues and 80% of its levered free cash flow within two years.

38.     According to the Muddy Waters Report, MultiPlan was in significant financial decline because of its fundamentally flawed business model, which profited from excessively high healthcare costs.  UnitedHealth had purportedly launched a competitor, Naviguard, to reduce its business with MultiPlan and bring the over-priced and conflicted services offered by MultiPlan in-house.  The Muddy Waters Report also accused MultiPlan of obscuring its deteriorating financial

position in presentations to investors by, among other things, manipulating cash reserves in order to show inflated earnings figures in the years leading up to the Merger. The Muddy Waters Report also stated that MultiPlan had suffered from material, undisclosed pricing pressures that had caused it to slash the "take rate" it charged customers in half in some instances and falsely characterized revenue declines as "idiosyncratic" when in fact they were due to sustained, negative pricing trends afflicting MultiPlan's business.

39.    The Muddy Waters Report further stated that MultiPlan's four previous private equity firm owners had "loot[ed] the business" for cash in the lead up to the Merger. According to the Muddy Waters Report, the sale to Churchill III was necessitated because MultiPlan's private equity owners could not find anyone else willing to buy the failing business after these deep cuts, which had resulted in deteriorating service quality and increased customer complaints. The Muddy Waters Report quoted two former MultiPlan executives who spoke about the private equity stewardship of the Company right before the Merger, which had purportedly left Churchill III's unwitting shareholders "hold[ing] the bag." These former MultiPlan executives stated in pertinent part as follows:

Former MPLN Executive A:

*Their thinking wasn't, 'How do we innovate?'. It was, 'How do we continue to cut this to the bone so we can sell it for as much as possible?'. . . 'How do we play the game of just having enough resources to keep the lights on?' The hope was, there was going to be one more [flip]."*

*"You start to get into those levels of those valuation where you get bought for 7.5 [billion] and you're saying, 'we're not going to sell this for less than 10.' There's a lot of things you can buy for 10 billion dollars, a lot of good things, especially if you're a strategic . . . I didn't think they'd have another go of just selling the company outright."*

Former MPLN Executive B:

*"When we were at MultiPlan, we all were like, 'Who's going to hold the bag?' Who's going to be stuck with the chair? We figured it was going to be H&F,*

*and it's . . . yeah.  It's no secret that H&F have tried to flip this numerous times.  The debts are due and they need cash, I guess."*

40.    The Muddy Waters Report stated that the decline in MultiPlan's sales left the Company "no choice but to try to buy some form of revenue growth to mask eroding fundamentals." Indeed, MultiPlan had just recently announced the acquisition of healthcare technology company HST for $140 million, which performed similar functions to those offered by Naviguard.  The Muddy Waters Report described HST as "an attempt to buy an inferior, significantly smaller Naviguard stand-in, and at a premium price" from a former MultiPlan executive.

41.    As a result of this news, the price of Churchill III securities plummeted.  By November 12, 2020, the price of Churchill III Class A common stock fell to a low of just $6.12 per share, nearly ***40% below*** the price at which shareholders could have redeemed their shares at the time of the shareholder vote on the Merger.

42.    The price of Churchill III stock has remained depressed despite MultiPlan's efforts to deny the allegations of the Muddy Waters Report, indicating that the market finds the allegations credible and compelling.  In fact, MultiPlan has confirmed that revenues from UnitedHealthcare declined year-over-year in the third fiscal quarter of 2020, as the Company's overall revenues declined 9%.  MultiPlan has also continued to make expensive acquisitions as predicted by the Muddy Waters Report.  In addition to HST, on January 21, 2021, MultiPlan announced the acquisition of payment integrity specialist Discovery Health Partners for $155 million plus transaction costs.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

43.    The Class Period begins on July 12, 2020.  On that date, Churchill III and MultiPlan issued a joint press release announcing their agreement to combine.  The release stated that the initial enterprise value for MultiPlan was approximately $11 billion or 12.9x estimated 2021 adjusted

earnings before interest, taxes, depreciation and amortization ("EBITDA").  The release described

the purported benefits to be gained from the deal in pertinent part as follows:

> The capital from this transaction, combined with Churchill's expertise, will enable MultiPlan to continue to enhance its core offerings to payers through a significant increase in its data analytics platform, extend into new payer customer segments and expand its platform, increasing the value MultiPlan provides to more than 700 payers, their 60 million consumers and MultiPlan's 1.2 million providers that serve them.  Further, the transaction will better position MultiPlan to capitalize on the entire $50 plus billion total addressable market, rather than its current subset of $8 billion, organically and through M&A.

> Mark Tabak, CEO of MultiPlan, stated, "I'm tremendously proud of the role MultiPlan plays in driving order, efficiency and fairness in healthcare payments. This transaction allows us to create payer value beyond the tech-enabled cost management and payment integrity services we offer today.  As a public company, MultiPlan will have greater strategic and financial flexibility, making it better equipped to expand organically, through adjacent acquisitions and by investing in new technologies.  We will deliver even more value for healthcare payers in particular, but also for their consumers and providers."

*     *     *

> "We are pleased to partner with MultiPlan to drive its next phase of growth. MultiPlan is on the right side of healthcare, significantly reducing costs to insurers, employers and consumers," said Michael S. Klein, Chairman and CEO of Churchill. "MultiPlan has an unmatched, long-term track record of customer satisfaction and delivering high returns to investors.  This transaction will enable the Company to enhance its capital structure and position it for substantial incremental growth. MultiPlan fits perfectly with Churchill's core mission to provide intellectual and financial capital to power the growth of great, market leading companies who operate in attractive industries, and can succeed more rapidly in the public markets with increased capital and the benefit of Churchill's Operating and Strategic Partners."

> MultiPlan pioneered innovative and mission-critical transaction processing services for healthcare payers, including the industry's largest independent preferred provider network, that reduce medical spend, improve payment accuracy and advance their competitive position. MultiPlan's data- and technology-driven services leverage the Company's 40 years of claim data, national reach, expansive provider network, strong relationships, innovative intellectual property and modern scale technology platform to create value for all stakeholders in the healthcare ecosystem. Further, MultiPlan brings affordability and fairness, delivering approximately $19 billion in medical cost reduction on over 135 million claims – bringing savings to payers and consumers alike.

44.     On August 18, 2020, Churchill III and MultiPlan jointly hosted an Analyst Day with investors that was led by defendants Michael Klein, Tabak, Redmond and Galant.  In his prepared remarks, defendant Tabak stated that MultiPlan had experienced significant historical revenue growth, "consistent" customer growth and was poised to seize additional "high growth" opportunities as a result of the Merger.  Defendant Tabak stated in pertinent part as follows:

> We have a proven track record with historical revenue growth of 6% to 7% annually since 2007, producing robust margins and a high conversion to free cash flow.  Our growth is driven by consistent increase in the number of customers we serve.  The growth in the number of claims that we receive.  Medical inflation, the ever-increasing algorithms we develop to identify clinical and financial aberrations that drive overall savings.  MultiPlan has additional growth opportunities in front of us.  And as a result of this merger with Churchill into a public company, we will share these with you throughout the session today.
>
> We will enhance our existing business, extend our business into adjacent markets and to new customers, and expand the platform beyond payers, to providers and consumers, enlarging our TAM.  We will increase our growth trajectory organically, and through a more aggressive focus on identifying accretive opportunistic M&A opportunities.
>
> All said, we will redeploy invest capital to drive MultiPlan's growth rate beyond the 6% to 7% CAGR and build upon the proven track-record of generating robust margins and conversion to free cash flow.

45.     In his prepared remarks, defendant Michael Klein stressed the purportedly "critical" services that MultiPlan provided to its clients and the dependable nature of the revenues that would be received from MultiPlan's largest clients, stating in pertinent part as follows:

> So we were quite taken by the customers' view that MultiPlan was critical to them, was valuable to them, and was a company that they would be providing more of their internal and external business to MultiPlan over the coming years now. You've heard from the team, so I won't be repetitive but what we found compelling is that: A, the market is growing significantly and continues to grow on a basis that has consistency that we can actually really forecast based upon the cost structure of U.S. healthcare.  We can do so because the company has 100% contracted revenues. We can do so because the customers have long-term relationships, 75% of which are more than three years in terms of contract length, but all of them have long and deep historical relationships.

We also can be comfortable underwriting our forecasts, because the growth opportunity ahead is based principally upon achieving more revenues from the same clients using the same services.  That's very rare as I think you will understand that a company can grow and double their top-line by applying the same services to the same customers by taking more wallet share.  We've also felt it's critical in our prior situations and certainly in this situation, to set the balance sheet up to win.  So as you heard from Dave, we have raised substantial capital, we have reduced substantially the leverage on this company.

46.      During the question and answer portion of the Analyst Day, defendants were asked about the risk that a MultiPlan customer could internalize the services offered by MultiPlan. Defendants rejected this idea, stating that it would be impracticable because of the competitive advantages possessed by MultiPlan and the unique benefits offered by the MultiPlan platform.  For example, MultiPlan's Chief Revenue Officer stated, "we've never worried about payers internalizing some of the basic algorithms" because MultiPlan's value-add purportedly extends "well beyond that."  Defendant Galant likewise stated in pertinent part:

Yeah.  Look, I think this is an area that we did an enormous amount of diligence on as you could well imagine.  The company plays this very mission critical role in the industry.  And so we wanted to understand, what are the possible disruptors?  Can people internalize, technically, I think that it's very clear.  People can internalize and create their own algorithms.  The difference here, and this is really important is twofold.  Number one, we see data across 700 payers.  That data is much, much larger and more diverse than what any single payer has within their system.  Okay.  And so that is a massively important point of differentiation.  We build our algorithms on a much larger data lake.  And because we do that, we believe our products generate bigger savings, whether it's payment integrity or analytics. Okay.

The second thing is just the practical one, which is if a payer decides to do everything on their own.  Their ability to go back to providers, and push for savings is fundamentally different than ours.  We are the third-party independent source.  The gold standard, if you will, of that data that we capture and analyze.  And so we can talk to the entire industry, we don't have to talk to anyone specific payer when we do that.

And so just from a political or practical, any way you want to slice it, we are a much better mechanism by which payers can reduce the cost of healthcare versus doing it themselves.  In terms of R&D, and how we think about this space.  Look, we see the solutions that we bring to market, as Mark said, constantly evolving.  And so the R&D dollars that we put in are going to be as you might expect, how do we take

the algorithms, how do we take the data and be able to generate more savings from it, and to be able to generate better ways, if you will, for constituents to tap into us through licensing as an example, to improve the product.

47.     The investor slide presentation provided during the Analyst Day stated that MultiPlan enjoyed "Revenue and Adj. EBITDA gr[owth] at ~6% and ~9% CAGRs from 2013 to 2019, respectively."  Although it stated that there had been a slight decrease in revenues and adjusted earnings for 2018 and 2019, the slide presentation represented that these "2018 and 2019 growth was impacted by idiosyncratic customer behavior that began in Q3 2018, with the full impact of this behavior change felt in Q4 2018 and throughout 2019."  The slide presentation further stated that this "idiosyncratic" behavior only impacted a small group of clients and was "not broadly seen across MultiPlan's over 700 payer clients."

48.     When asked during the Analyst Day to explain in more detail the specific customer issue impacting MultiPlan's 2018 and 2019 revenues, defendant Redmond stated that the impact related to regulatory and compliance issues affecting only a small subset of customers that had been "resolved" in 2019.  He further represented that the lost revenues would "methodically come back into our revenue over the next few years."

49.     On September 18, 2020, defendants filed with the SEC the final Proxy for the Merger on Form DEFM14A.  The Proxy stated that the Board unanimously recommended that shareholders vote in favor of the Merger.  The Proxy provide numerous purported reasons supporting this recommendation, stating in pertinent part as follows:

- **Attractive Valuation**.  As more fully described under "– *Comparable Company Analysis*," the purchase price values MultiPlan at a discount to selected comparable companies with respect to MultiPlan's pro forma implied enterprise value as a multiple of adjusted EBITDA, as well as MultiPlan's pro forma implied equity value as a multiple of levered free cash flow, in each case, for estimated calendar year 2021.

- **Reasonableness of Aggregate Consideration**.  Following a review of the financial data provided to Churchill, including MultiPlan's historical financial

- 14 -

statements and certain unaudited prospective financial information, Churchill's due diligence review of the MultiPlan business, the views of Churchill's financial advisors (which supported Churchill management's view regarding valuation), the results of the comparable company analysis for the valuation metrics presented and the support for the valuation of MultiPlan implied by the Transactions indicated by the successful commitments obtained in the PIPE Investment, as well as the execution of the Voting and Support Agreements and the Non-Redemption Agreements by holders of 28,979,500 shares of Churchill's Class A common stock, the Churchill Board considered the aggregate consideration to be paid and determined that the aggregate consideration was reasonable in light of such data and financial information.

- ***Opportunities for Growth in Revenues, Adjusted EBITDA and Free Cash Flow***.  With a strategic plan that involves providing MultiPlan's existing services to its existing customers, refining MultiPlan's existing products to increase healthcare expense affordability, extending MultiPlan's platform for new use cases and expanding MultiPlan's platform for new business models (as further described in "*Information about MultiPlan – Our Strategy*"), the Churchill Board believed that MultiPlan, on a pro forma basis, could achieve (i) 11-15% annual revenue growth (as compared to 6-8%, if MultiPlan just de-levered as a result of the Transactions and did not implement the strategic plan) representing up to $1.15 billion in incremental revenue and (ii) a 72-77% margin for adjusted EBITDA (as compared to 75-80%, if MultiPlan just de-levered as a result of the Transactions and did not implement the strategic plan) which would result in an illustrative estimated range for adjusted EBITDA in 2025 of approximately $1.275 billion to $1.395 billion, in the case of each of clauses (i) and (ii), assuming successful implementation of the anticipated enhance, extend and expand strategy within 3 -5 years after implementing the applicable initiatives. The Churchill Board believed that the pro forma business could achieve levered free cash flow conversion of 60-70%, assuming successful implementation of the enhance, extend and expand strategy (representing an illustrative estimated range for levered free cash flow in 2025 of approximately $750 million to $925 million), depending upon MultiPlan's investment decisions and capital structure.

- ***Industry Leadership in End-to-End Healthcare Cost Management and Value-Add Claims Payment Processing in the U.S. Healthcare Industry as measured by revenue and claims processed***.  MultiPlan is a leading value-added provider of data analytics and technology-enabled end-to-end cost management solutions to the U.S. healthcare industry as measured by revenue and claims processed with strong fundamentals and a 40-year track record of driving healthcare affordability and delivering value to its customers.  Its operations include approximately 1.2 million providers under contract, more than 700 payer customers and more than 60 million consumers on its platform.  The Churchill Board believed that MultiPlan's vast network, comprehensive and diverse data, intellectual property, and proprietary algorithms position it for significant strategic and financial flexibility to accelerate growth.

- ***Business and Financial Condition and Prospects***.  After conducting extensive due diligence, along with their familiarity with MultiPlan's business from prior commercial experiences, the Churchill Board and Churchill management had knowledge of, and were familiar with, MultiPlan's business, financial condition, results of operations (including favorable free cash flow generation and current EBITDA margins, as well as the recurring nature of MultiPlan's revenues) and future growth prospects.  The Churchill Board considered the results of the due diligence review of MultiPlan's business, including its comprehensive and diverse data, intellectual property and network assets, its payor customers, its ability to enhance, extend and expand its platform, the potential impact of COVID-19 on its business, as well as Churchill management having had the opportunity to communicate with senior leaders of several large customers of MultiPlan to better understand the quality and nature of those relationships, as well as the competitive environment in which MultiPlan operates.  The Churchill Board also discussed MultiPlan's current prospects for growth in executing upon and achieving its business plan, and its ability expand the reach of its proprietary platform by integrating new data sources/algorithms, improving API depth and quality, and operationalizing a licensing driven business model to partner with existing software and financial services companies targeting providers and consumers.

*     *     *

- ***MultiPlan Being an Attractive Target***.  The Churchill Board considered the fact that MultiPlan (i) is of a size relevant to the public marketplace, (ii) has a strong existing management team, (iii) has a significant total addressable market and growth expansion opportunities, (iv) provides an opportunity for operational improvement and (v) would benefit from the consummation of the Transactions as a result of becoming a public company and de-leveraging, which the Churchill Board believed would improve MultiPlan's ability to grow, including through acquisitions.

50.    The Proxy listed an evaluation of the purportedly favorable "competitive landscape" as a primary consideration underpinning the Board's recommendation that shareholders vote in favor of the Merger.  Although the Proxy mentioned the importance of competition to MultiPlan's business and prospects and purported to identify MultiPlan's most significant competitors, it did not list Naviguard or UnitedHealthcare as a potential competitive threat.  The Proxy also provided various "competitive strengths" which it claimed "position [MultiPlan] for future growth," stating in pertinent part as follows:

***Long-standing customer relationships***.  We believe that we have strong relationships with our customers, which include substantially all of the largest health plans.  We have a diversified customer base and long-standing relationships with our top customers.  Our top ten customers have been customers for an average of 25 years.  Our contracts with large customers generally have terms of three to five years while other contracts have terms of one year that include automatic renewals (although most contracts permit early termination without penalty and with short notice periods).  Once a contract is signed with a payor, we have typically retained that customer for many years, and the volume of claims repriced typically continues to grow as we introduce new services or receive more claims by strengthening electronic data interchange ("*EDI*") connectivity or deepening penetration.  Our customer relationships are further strengthened by high switching costs for our customers as MultiPlan is both electronically linked to customers in their time-sensitive claims processing functions and its logo is often featured on commercial customers' membership cards when networks are used.

***Proprietary, scalable and secure IT platform***.  We believe that our IT platform provides us with a substantial competitive advantage.  Recently, we have made significant investments in upgrading our IT infrastructure which is certified under HITRUST, NIST and AICPA SOC programs and in May 2020 was rated #1 among healthcare companies by BitSight, an IT security rating organization.  This upgrade enables us to automatically process and store significantly more transactions and greatly improve our capacity to serve our customers.  It is designed for high throughput: our proprietary network repricing application is capable of returning approximately 99.96% of network claims to our payor customers within one business day.  For example, in our payment integrity and MRA services we return 99.4% and 96.3% of claims within one day.  We also have implemented connectivity via EDI (the sending and receiving of claims data between entities in an agreed upon electronic format) or direct web service integration with all of our top customers.  In the year ended December 31, 2019, nearly all of the claims processed in our system were received via EDI or direct web service integration.  As we process more claims through EDI and direct web service integration, our electronic integration with customers results in substantial back office interconnectivity and considerably reduces complexity and processing failures.  As our IT platform is scalable, it is able to absorb significant increases in volume at minimal marginal costs.  Today our platform accesses historical claims data for 1 billion claims and processes 370,000 claims per day with the capacity to grow substantially within our current infrastructure.

***Comprehensive Services***.  We believe the combination of our Analytics-Based, Network-Based and Payment Integrity services is the most comprehensive in the industry.  Our network of providers includes approximately 5,600 hospitals, 164,000 ancillary facilities, and 1,075,000 practitioners.  We employ approximately 450 negotiators and support staff, 100 clinicians, medical coders, data scientists and others dedicated to creating payment integrity analytic algorithms, and over 600 IT and 500 operations and service staff focused on MRA and the back-end services associated with all three solution areas.  In 2019 these services reduced claims worth

over $45 billion in charges.  Moreover, the solutions are highly customizable, so payors can use them in any combination and in any order to achieve the objectives each of their customers seek.

*Strong cash flow generation*.  We have historically been able to generate strong cash flow from operations less capital expenditures because of low capital expenditure requirements and minimal working capital needs.  For example, MultiPlan's capital expenditures as a percentage of revenues were less than 7% in each of the last three fiscal years.  Our current strategy may require moderate additional capital investment in the near future as our internally developed IT platform is highly scalable.  Our ability to generate strong and consistent cash flow has historically enabled us to invest in our operations, opportunistically reduce our debt and pursue attractive growth opportunities.

*Proven and experienced management team*.  Our chief executive officer, chief financial officer and chief revenue officer have over 100 years of combined experience managing and leading companies in the healthcare cost management industry.  Despite significant payor consolidation over the past several years, our management team has continued to develop new revenue opportunities, expand our margins and strengthen our customer relationships.  In addition, our management team has successfully grown our operations in size and profitability through a combination of focused network and product expansion, cost initiatives and acquisitions.  Our management team also has a successful track record of acquiring, integrating and managing healthcare businesses.

*Limited legal and regulatory risks*.  We believe that each of MultiPlan's service offerings bears less risk than other healthcare businesses that bear insurance risk and bill federal healthcare programs or directly provide care.  While we support our customers that are regulated entities, we generally are not directly regulated or face significantly lower levels of regulatory complexity.  We function as a transaction processor and we believe we have limited risk for services or billing.

51.    The Proxy discussed the material importance to MultiPlan of its largest customers, but failed to disclose any loss of business from these customers.  Instead, the Proxy highlighted that MultiPlan had recently grown its revenue share attributable to its largest two customers from 50% in 2018 to 55% in 2019.  The Proxy stated in pertinent part as follows:

**Customer Concentration**

Two customers individually accounted for 35% and 20% of revenues during the year ended December 31, 2019.  During the year ended December 31, 2018, two customers individually accounted for 30% and 20% of revenues.  During the year ended December 31, 2017, two customers individually accounted for 31% and 18% of revenues.  The loss of the business of one or more of the Company's larger

customers could have a material adverse effect on the Company's results of operations.

52.    The Proxy also provided certain revenue and earnings information for MultiPlan, stating that MultiPlan was projected to achieve between $1.085 billion and $1.125 billion in total revenue, between $845 million and $975 million in adjusted EBITDA, and between $425 million and $450 million in levered cash flow in 2021.

53.    The statements referenced in ¶¶43-52 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, as follows:

(a)    that MultiPlan was losing tens of millions of dollars in sales and revenues to Naviguard, a competitor created by one of MultiPlan's largest customers, UnitedHealthcare, which threatened up to 35% of the Company's sales and 80% of its levered cash flows by 2022;

(b)    that sales and revenue declines in the quarters leading up to the Merger were not due to "idiosyncratic" customer behaviors as represented, but rather due to a fundamental deterioration in demand for MultiPlan's services and increased competition, as payors developed competing services and sought alternatives to eliminating excessive healthcare costs;

(c)    that MultiPlan was facing significant pricing pressures for its services and had been forced to materially reduce its take rate in the lead up to the Merger by insurers, who had expressed dissatisfaction with the price and quality of MultiPlan's services and balanced billing practices, causing the Company's to cut its take rate by up to half in some cases;

(d)    that, as a result of (a)-(c) above, MultiPlan was set to continue to suffer from revenues and earnings declines, increased competition and deteriorating pricing dynamics following the Merger;

(e)      that, as a result of (a)-(d) above, MultiPlan was forced to seek continued revenue growth and to improve its competitive positioning through pricey acquisitions, including through the purchase of HST for $140 million at a premium price from a former MultiPlan executive only one month after the Merger; and

(f)      that, as a result of (a)-(e) above, Churchill III investors had grossly overpaid for the acquisition of MultiPlan in the Merger, and MultiPlan's business was worth far less than represented to investors.

## NO SAFE HARBOR

54.     Defendants' "Safe Harbor" warnings accompanying their reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most if not all of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

55.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Churchill III or MultiPlan who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

**LOSS CAUSATION**

56.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Churchill III securities and operated as a fraud or deceit on purchasers of Churchill III securities.  As detailed above, when the truth about defendants' misconduct was revealed over time, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up the price of the securities.  The declines in the price of Churchill III securities were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and other members of the Class (defined below) were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members, was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

57.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Churchill III's business, operations, competition and financial condition, as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Churchill III's securities to be artificially inflated.  Plaintiff and other Class members purchased Churchill III securities at artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

58.     At all relevant times, the market for Churchill III securities was an efficient market for the following reasons, among others:

(a)     Churchill III securities met the requirements for listing and were listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     according to the Company's Form 10-Q filed November 13, 2020, there were over 667 million Churchill III Class A common shares outstaring as of November 11, 2020, demonstrating a very active and broad market for the Churchill III securities;

(c)     as a regulated issuer, Churchill III filed periodic public reports with the SEC;

(d)     Churchill III regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about Churchill III was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

59.     As a result of the foregoing, the market for Churchill III securities promptly digested current information regarding Churchill III from publicly available sources and reflected such information in the prices for Churchill III securities.  Under these circumstances, all purchasers of Churchill III securities during the Class Period suffered similar injury through their purchase of Churchill III securities at artificially inflated prices, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of: (i) all purchasers of Churchill III securities during the Class Period who were damaged thereby; and (ii) all holders of Churchill III Class A common stock entitled to vote on the Merger

(the "Class").  Excluded from the Class are defendants and their families, the officers and directors

of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns, and any entity in which defendants have or had a

controlling interest.

61.     The Class is so numerous that joinder of all members is impracticable.  Throughout

the Class Period, Churchill III securities were actively traded on the NYSE.  Upon information and

belief, these shares are held by hundreds or thousands of individuals located geographically

throughout the country.

62.     There are questions of law and fact that are common to the Class, including:

(a)     whether defendants omitted and/or misrepresented material facts;

(b)     whether defendants violated §14(a) of the Exchange Act by misrepresenting

or omitting material information in the Proxy;

(c)     whether, in violation of §10(b) of the Exchange Act, defendants knew or

recklessly disregarded that their statements were false;

(d)     whether the Blank Check Sponsor Defendants and the Individual Defendants

are liable as "controlling persons" under §20(a) of the Exchange Act;

(e)     whether the prices of Churchill III securities were artificially inflated during

the Class Period; and

(f)     whether plaintiff and the other members of the Class were injured as a result

of defendants' misconduct and the extent of and appropriate measure of damages.

63.     Plaintiff's claims are typical of the claims of the other members of the Class, and

plaintiff is not subject to any atypical claims or defenses.  Plaintiff is committed to prosecuting this

action and has retained competent counsel experienced in litigation of this nature.  Plaintiff has the

same interests as the other members of the Class.   Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

64.   Prosecution of individual actions would create a risk of inconsistent adjudications.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

65.   Plaintiff incorporates ¶¶1-64 by reference.

66.   During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, directly and indirectly, by the use of the means or instrumentality of interstate commerce, or the mails or facility of a national securities exchange:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Churchill III securities during the Class Period.

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Churchill III securities.  Plaintiff and the Class would not have purchased Churchill III securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

69.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

70.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Churchill III securities during the Class Period.

## COUNT II

### For Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants

71.     Plaintiff incorporates ¶¶1-70 by reference.

72.     This Count does not sound in fraud.  Plaintiff does not allege that defendants had scienter or fraudulent intent for the purposes of this Count as they are not elements of a §14(a) claim.

73.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

74.     Defendants prepared and disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

75.     By virtue of their positions within Churchill III, the Blank Check Sponsor Defendants and/or MultiPlan and their due diligence regarding the Merger, defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by defendants.  The Proxy misrepresented and/or omitted material facts, as detailed above.  Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

76.     As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Proxy was an essential link in the consummation of the Merger.  Defendants also failed to correct the Proxy prior to the Merger and the failure to update and correct false statements is also a violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

77.     As a direct result of defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, plaintiff and the Class were precluded from exercising their right to seek redemption of their Churchill III shares prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger. The false and misleading Proxy used to obtain shareholder approval of the Merger deprived plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Churchill III shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning the true value of MultiPlan, which was far below the assets that shareholders

received in the Merger.  Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Merger, plaintiff and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

78.     The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

79.     By reason of the foregoing, defendants have violated §14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

COUNT III

For Violation of §20(a) of the Exchange Act<br>Against the Blank Check Sponsor Defendants and the Individual Defendants

80.     Plaintiff incorporates ¶¶1-79 by reference.

81.     Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

82.     The Blank Check Sponsor Defendants and the Individual Defendants were controlling persons of Churchill III and/or MultiPlan, as detailed herein, within the meaning of §20(a) of the Exchange Act.

83.     The Individual Defendants, by virtue of their high-level positions as officers and/or directors of Churchill III, the Blank Check Sponsor Defendants and/or MultiPlan, participated in the operation and management of Churchill III, the Blank Check Sponsor Defendants and/or MultiPlan, and conducted and participated, directly and indirectly, in the conduct of the companies' business affairs, and therefore exercised general control over the operations of Churchill III, the Blank Check Sponsor Defendants and MultiPlan.  The Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Churchill III, the Blank Check Sponsor Defendants and MultiPlan, including the identification of target companies to be acquired by Churchill III, the evaluation of MultiPlan, and the content and dissemination of the Proxy and the statements which plaintiff contends were false and misleading during the Class Period, as detailed herein.

84.     Likewise, the Blank Check Sponsor Defendants, as the sponsors of the IPO, Churchill III and the Merger, and due to their influence and control over the Board, ownership of Churchill III shares and historical relationships with Churchill III's management, exercised general control over the operations of the Company and its business affairs.  The Blank Check Sponsor Defendants, either directly or indirectly through their affiliates, established Churchill III, selected Churchill III's management and the members of the Board, granted themselves substantial benefits in the IPO and the Merger, participated in the identification of target companies to be acquired by Churchill III, evaluated MultiPlan, and influenced and controlled the drafting of the Proxy, which plaintiff contends was false and misleading, among other materially false and misleading statements issued by Churchill III during the Class Period.

85.     The Blank Check Sponsor Defendants and the Individual Defendants, by virtue of their positions as owners, officers and/or directors of Churchill III and/or MultiPlan, had the power

or ability to control the issuance, publication, and contents of the Proxy and the other statements by Churchill III and/or MultiPlan as detailed herein.  The Blank Check Sponsor Defendants and the Individual Defendants were each involved in negotiating, reviewing and approving the Merger.  The Proxy purports to describe the various issues and information that the Blank Check Sponsor Defendants and the Individual Defendants reviewed and considered concerning the Merger.  The Blank Check Sponsor Defendants and the Individual Defendants, by virtue of their positions as owners, officers and/or directors of Churchill III and/or MultiPlan, had the ability to prevent the issuance of the materially misleading Proxy and actionable statements made to investors during the Class Period as detailed herein, or to cause these statements to be corrected so that they were not in violation of the Exchange Act.

86.    By virtue of the foregoing, the Blank Check Sponsor Defendants and the Individual Defendants violated §20(a) of the Exchange Act, and plaintiff is entitled to relief.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Declaring that the Proxy distributed by defendants to shareholders was materially false and misleading, in violation of Rule 14a-9 and §14(a) of the Exchange Act;

D.    Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

E.      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 24, 2021            ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     SAMUEL H. RUDMAN


                                            *s/ Samuel H. Rudman*
                                     _____
                                          SAMUEL H. RUDMAN

                                     58 South Service Road, Suite 200
                                     Melville, NY  11747
                                     Telephone:  631/367-7100
                                     631/367-1173 (fax)
                                     srudman@rgrdlaw.com

                                     ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     BRIAN E. COCHRAN
                                     200 South Wacker Drive, 31st Floor
                                     Chicago, IL 60606
                                     Telephone:  312/674-4674
                                     312/674-4676 (fax)
                                     bcochran@rgrdlaw.com

                                     JOHNSON FISTEL, LLP
                                     RALPH M. STONE
                                     1700 Broadway, 41st Floor
                                     New York, NY  10019
                                     Telephone:  212/292-5690
                                     212/292-5680 (fax)
                                     ralphs@johnsonfistel.com

                                     Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

JENNIFER M. SROCK ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __9__ day of February, 2021.

_____

JENNIFER M. SROCK

MULTIPLAN

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 09/22/2020 | 100 | $11.25 |
| 10/02/2020 | 50 | $10.00 |

Prices listed are rounded up to two decimal places.